Orthopedic and Medtronic et al. v. Nuvasiv, Inc., 2013, 1576-1577. I apologize if we were a little uncertain about how we wanted to arrange this. As I understand it, both of these appeals were filed on the same day, but we had a blue brief and a red brief labeled across appeal. So we will, and we've allowed you each 20 minutes, you've indicated how you want to divide it. And so we will hear Mr. Doshoe, is it? It's Doshoe, that's right. Doshoe arguing the, what's in the blue brief, the 236 infringement, supplemental damages and ongoing royalty, and then Ms. Maynard on the cross-appeal issues, 973 validity, 933 infringement and lost profits. And your second argument will be limited to those cross-appeal issues. So, Mr. Doshoe. Thank you, Your Honor. One point of clarification, Your Honor. There was an order issued requesting that the cross-appeal issues be addressed. That's what I hope to nullify, in effect, by what I just said. We would expect you to deal with the issues in the blue brief. With the issues in the blue brief. All right, Your Honor. Well, the issues in the blue brief. Which isn't telling you how much time you ought to spend on each issue. No, fair enough, I understand that. So let me begin with the points that Warsaw Orthopedic raised in its appeal. And there are really three issues, Your Honor. The first one is... Let's talk about the ongoing royalty for a moment. Yes, Your Honor. You agree, I assume, that with respect to the implants, that you can't both get lost profits and a reasonable royalty, correct? That's correct. Okay. So it seems to me that's exactly what you're trying to do with respect to the ongoing royalty. You want a reasonable royalty with respect to the implants. And you also want to get lost profits with respect to that. Well, the two key issues with the ongoing royalty question are as follows. The first one is that the jury came back affirmatively finding that Warsaw Orthopedic suffered lost profits as a result of the infringement. I'm not talking about... Let me make it clear. I'm not talking about the convoyed sales. Let's put that aside. Okay. I'm talking about the rest of what you have lumped into the category of lost profits. And those are royalty payments from related companies to Warsaw. So you're seeking that as lost profits, and then you're also seeking a reasonable royalty. And isn't that duplicative? Now, is Your Honor referring to the $100 million verdict that the jury came back with in that context, or are we talking about the ongoing royalty? I'm talking about the ongoing royalty for the post-verdict period. Not the 14 months, but after that. The ongoing royalty in lieu of the injunction. That's correct. And what we requested... I mean, again, the issue that we have... No, we don't claim to be entitled to both a royalty and lost profits. And, of course, an ongoing royalty has, by definition, it's a royalty. But what we are saying where the district court erred is in calculating the royalty. It did so without acknowledging the lost profits component. So what we had proposed to the district court was that a royalty be calculated that, in effect, compensates Warsaw Orthopedic for its lost profits on an ongoing basis. Yeah, but my problem is this. One, at the same time, you're saying we want a reasonable royalty. And we also want, as a component of lost profits, the payments from these related companies to Warsaw, which they themselves characterized as royalties. Oh, now I understand the point, Your Honor. Well, the only royalty, the only lost profits sought at trial were Warsaw's own lost profits. Right, but the component of that... Correct. ...was the royalty payment that was made from the related companies to Warsaw. That's absolutely right, which is appropriate under BIC, the court's decision in BIC, which we cite. And so... How could it be appropriate to get both a reasonable royalty and recover the actual royalty? Well, fair question, Your Honor. So part of the compensation that Warsaw received for sophomore Danik's ultimate sale to end users was a reasonable royalty. That was part of it. And under this court's authority in BIC, that is a legitimate lost profit component, because that is ultimately a profit that comes to Warsaw. And so that's where that reasonable royalty comes from. I'm sorry, I'm not understanding. I mean, it just seems to me completely duplicated. One, at the same time, you're saying we want a reasonable royalty on the implant, and then you say we want to recover, in addition, as lost profits, the royalty payments that were made from the related companies to Warsaw with respect to the items. I mean, why isn't that completely duplicative? No, it is not duplicative, Your Honor, if you consider this. So we begin with what Warsaw lost, the Warsaw lost profits. A component of the Warsaw lost profits is money that would have come to Warsaw... As a royalty. As a royalty. That's just one component of the lost profits. I understand. I've put aside the convoyed sales as a separate issue about lost profits. But I'm talking about the royalty component of the lost profits claim is completely duplicative of the reasonable royalty that you're also seeking to recover. It is not duplicative, Your Honor, because what we would ask the district court to do on an ongoing royalty basis... And the issue here, Your Honor, we're not asking the court to handle the ongoing royalty issue. What we're basically asking for is a remand. Well, I understand, but the reason you want the remand is you say she didn't give you enough because she didn't give you both a reasonable royalty and a royalty component of lost profits. That's not what we're saying. What we're saying is the district court erred in setting the reasonable royalty, basically limiting the compensation, basically taking all of the lost profit component that the jury had given and excising that out and focusing exclusively on a reasonable royalty that did not take into account... But are you seeking both with respect to the... No. That's just an abstraction. Are you seeking both the reasonable royalty and the actual royalty that was paid by the related companies to Warsaw? What we are seeking is the actual royalty. I mean, on a going forward basis. So are you looking for an increased royalty post-verdict? Yes, Your Honor. Okay. So on what basis is it increased? It's increased because the royalty that the district court came up with only took into account, essentially, basically the ongoing royalty was treated as if we came out of trial with the jury finding no entitlement to lost profit. That's the fundamental issue. So you're looking to tack on to the reasonable royalty lost profit. What we are asking for is... I think this... I agree with Judge Daikin in his questioning to you. It seems to me that you're looking for both. You're going to have to explain on what basis you think you're entitled to an increased royalty post-verdict. Well, the increased royalty post-verdict. So post-verdict, we are back... I mean, post-verdict, we are now in a situation where the injunction was denied. Warsaw needs to be compensated for new basis, ongoing infringement, if you will, willful infringement, if you will. Now the question is, how do we compensate? Well, a tool to compensate Warsaw is a royalty. Now the question is, how much do we pay? How much is that royalty? What percentage of sales? Well, I understand that. But the problem is you're seeking on top of that a component of lost profits which goes beyond convoyed sales and which represents the royalty payment from the related companies to Warsaw, which is completely duplicative of the reasonable royalty. There is no duplicativeness, Your Honor, in terms of what we're asking. You have to explain to me why that's the case. Because you admit that you're seeking both a reasonable royalty and lost profits for the ongoing royalty, right? Well, what we're doing is... Yes? Yes. Okay. We are seeing an ongoing royalty... How can you get both? Well, because the lost profit component, there was a jury verdict that included a lost profit component. That lost profit component, the fact that Warsaw lost profits, was not accounted for in the ongoing royalty. How can the jury verdict tell you anything? Because if I read the instructions correctly, the instructions said, well, you get lost profits for the period 2004, or you get a reasonable royalty for 2004 to 2006, and then you get lost profits for 2006 on. Correct? That's correct. So that lump sum award by the jury has to have different components. For one part of the period, it's a reasonable royalty. For another part of the period, it's lost profits. No? Well, part of it... And you're right, Your Honor. It was all tied up. If I could move to a second issue in terms of our appeal... You can move on, but you haven't explained to me why you're not seeking duplicative recovery. But you can go ahead and move on. All right, Your Honor. So let's turn to the 236 patent, the Nuvasiv 236. The issue there, of course, is that that patent, and in order to distinguish the claims from the Raymond reference, what Nuvasiv did was added a stopping step, which is after the normal muscular response is elicited, what we have is the system stops the emission of a signal. And there is no factual dispute in this record. And the Nuvasiv's expert, Dr. Raymond, admitted this time and time again, that the Nemeclips, the accused Nemeclips system operates exactly like Raymond. And that is, we cited that in our briefs, but there's no issue. So what you have in Raymond is, the second the neuromuscular response is received, the signal drops, decreases. That's exactly what Nemeclips does. With Nemeclips, once the neuromuscular response is received, there is no stopping of the emission of the signal. Does the intensity of the signal decrease? Yes, it does. But that's just a function of the intensity of the pulses that are being emitted by the signal. The signal keeps going. Who's arguing that there's a permanent cessation of the stimuli signal? No one is arguing that. That is a red herring, Your Honor. No one is arguing. We're not arguing that that signal needs to permanently be off. What we're saying is, at some point, when that neuromuscular response is received, we need to have the stopping of the emission of pulses. And if you don't have that stopping, you don't meet the claim limitation, which we don't, and the factual record is undisputed on that. But it can start up again? Sure, it can. So at some point, you can have the signal altogether stop emitting pulses. And the record's clear. The frequency, Your Honor, of the pulse is being sent. The frequency never changed. Dr. Raymond agreed that with the nematodes. Neuromuscular response received, same frequency. The only thing that happens is you have a decrease in the strength of the pulse. What is it that stops it? The emission of the signals or that specific pulse that dictates the proximity of the nerve and triggers the neuromuscular response? Your Honor, that's precisely the issue. And Nuvasiv initially, and its positions have changed, initially took the position that all it needs to stop is the actual pulse that triggered the neuromuscular response. Well, that's a non sequitur because, of course, once that pulse is emitted, it's out. It's done. So it's not that you need a new pulse. It's that you need that signal to altogether stop the emission. So you need the stoppage of the emission of any pulse. And that is precisely what stopping the stimulation signal means. That's precisely why there's really no substantial evidence that can reasonably support the jury verdict that Mimiclips does infringe the 236. Does changing the frequency of a pulse, is that stopping the pulse? Is that stopping the signal rather? It is not. All you're doing is you're basically changing the frequency by which the pulses are emitted. But the pulses continue to be emitted. As long as the pulses continue to be emitted, you do not have the stoppage of the signal. One last point, and I see that I'm on my rebuttal time, Your Honors. One last point is the question of the damages between July of 2010 and the September 2011 verdict. Quite simply, Your Honors. That issue would become moot if we sent it back for a new trial on damages, right? If you send it back for a new trial on damages, yes, the point is the issue is mooted. Correct, Your Honor. If we send it back for a new trial on damages, do we need to address the supplemental damages? No, Your Honor, you don't. Why not? Because it's moot, and presumably if the entire thing gets sent back for a retrial on damages, that period of time is going to get captured anyway in the retrial. So that the gap, if you will, becomes moot. You'll be more explicit than you were the first time. Won't there be a new gap, a new potential of a gap then if there was one to begin with? Well, that's a fair question, Your Honor. And in theory, there will always be some gap. At some point, discovery will end, and you are going to have the trial. And so there are a slew of district court cases that handle the issue, much like we requested the district court here to do it, which is basically through an accounting that is consistent with the jury verdict. Well, mostly it's handled by telling the jury to award damages up to a particular date, and you didn't request that instruction here, right? Well, we did not request that instruction. But if we look at the Barb case that's cited, if we look at the jury form there, Your Honor, there was no end date on the damages. And the jury de facto was instructed that way. Well, in that case, apparently the jury made its decision based on – it made its decision. And we look at the entirety of the decision. Here, there are dates. So why shouldn't we hold the jury to its decision? Well, the short answer, Your Honor, is this. The jury was instructed that it could not speculate. The jury is assumed to follow the court's instructions, and that's the Supreme Court precedent law that we cite. The jury is assumed to have done that. And then where we go from there is if we look at the actual evidence before the jury, all of the damages evidence ended in June of 2010. That's the way the case was tried by our expert, their expert, and there was just absolutely no issue there. Yeah, but what you should have done was to ask for instruction that the jury should award damages up to X date, right? And you didn't do that. That's why we're in this mess where the record is unclear. Well, on the question of whether or not we should have done, there is no precedent from this court on that point, Your Honor. This is new. It's just a matter of common sense. If you want to get a verdict that's clear, you should ask for instruction that makes the verdict clear. Well, Your Honor, again, a number of district courts have dealt with the accounting issue without an instruction that puts the cutoff date in the actual verdict form. But with that, I'll leave it because I know that I'm eating into my rebuttal. We'll give you your full request of eight minutes back. All right. Thank you, Your Honor. Ms. Maynard. May it please the court? Deanne Maynard for Defendant Newbasis. The $100 million, more than $100 million judgment here should be reversed for multiple independent reasons going both to liability and damages. I'd like to start with the 973 patent, which should be- Let's start with Judge Dyke's question  is to basically make a statement that says we have a duplicitous award of damages based on licenses, license fees, and royalty payments. I agree with Your Honor that they can't get a duplicative recovery. And that that's what they are seeking, right? To the extent their reasonable royalties, they're seeking to try to up their reasonable royalty by including in it their lost profits. That is what they're trying to do. With respect to the ongoing royalty, I think the district court appropriately considered all the relevant factors, picked a number higher than what the jury had awarded for reasonable royalty and picked a number lower than what they wanted, but took into account the appropriate factors and there would no be- How can you get anything out of the jury verdict? I really don't understand it. I mean, there's this lump sum award and some reference to royalty percentages, but trying to parse the lump sum award seems to me to be impossible given the instruction that for part of the period up to 2006 they get a reasonable royalty and that after that they get lost profits. How can we parse that $101 million verdict? You can't, Your Honor. And I think if there's any error in- If you find any error with respect to liability or damages, you should remand for a new trial. And if you find- We would hope that you would clarify what could be in the bucket of damages when you do that because here- I would like to address liability, but here they've included in their damages things that they shouldn't be entitled to. Warsaw is essentially a non-practicing entity with respect to these patents. It either makes nor sells any product that competes with anything new base of sales. And under this court's precedent in poly-America, it's not entitled to lost profits. Well, that statement is correct to some extent. The problem is it's not completely correct. And the reason it's not completely correct is that one component of the lost profits is these convoyed sales of the screws and the rods and the biologics. So, and those are sales that Warsaw itself made, right? They don't make those to anybody outside their interrelated companies, Your Honor, and they don't- But they did sell them, so- They transferred them. The poly case doesn't give the answer to the question of whether they can recover that because those sales are sales that they themselves made. If you think that they can- We don't think they can recover those convoyed sales for a different reason. Because they're not functionally related. They're not functionally related. But that's the only reason, right? Well, I think, you know, to the extent- One could read poly-America, Judge Dyke, to say that you can't synthetically create lost profits. They aren't selling- No, but poly-America does include in it a statement that if you make sales yourself, you can recover for that. If you make sales that compete with sales that compete with the patented item. So it would- Then it does fold into the convoyed sales argument, but they shouldn't be able to recover for these unpatented rods and screws. Under this court's case law, it's no different than American seating. They're not functionally related. The evidence shows that the rods and screws aren't always used. They're put in later. Sometimes they're put in in a separate surgery completely. Was there evidence that the rods and screws were used on other implants other than the patented implant? The rods and screws, you could use interchangeable. Sometimes it was Medtronic's rods and screws that were used in- So these rods and screws- But just be clear about this. These rods and screws could be used with other implants not covered by this patent. I want to confirm that before I say yes or no. But standing here, so on rebuttal, I'll answer that question. But the evidence did show, Your Honor, that it was often not Nuvasiv's rods and screws that were used when Nuvasiv's implant was used. Yeah, that seems to me to be a different question. I think the functional relationship issue turns on whether their rods and screws can only be used with these implants or whether they can be used with other implants. I think the rods and screws are rods and screws and they can be used with any implant. So I'll confirm that. Give me the record site for that. I will, Your Honor, when I get back up. If I could- So we think there are multiple problems with the $100 million damages number. And if you send it back for anything else, we would request that you clarify what could be a bucket that they could seek and what couldn't. Because the true-up number vastly increased the damages asked. This is essentially just a polyameric issue. They basically contracted to take 95% of the profits of the selling entity. And that's what polyamerica says you can't do. You can't synthetically create these kinds of profits. And that was the largest bucket of the three buckets. But I would like to touch on liability because I think that you wouldn't have to answer the damages questions if you set aside a liability verdict. And I think you should set aside the liability verdict here. Under the claim construction adopted by the district court, under which the jury was instructed, and which they don't challenge here, this 973 patent is anticipated by the Brantigan Prior Art. This is just- Well, under the claim construction, does it have to be capable of lateral insertion? It has to be- Yes, that was the claim construction. But the jury instruction, Judge Dyke- Yeah, go ahead. The jury instruction, which is on A-206, the court at our request instructed the jury that- So it did instruct the jury, as you were suggesting, Judge Dyke, the court construes the term translateral spinal implant to mean a spinal implant capable of being inserted translaterally. And then the court goes on- Does translaterally mean the same thing as laterally? Basically, translaterally is just a mode of use, Your Honor. But does it mean the same thing as laterally? We think so. Okay. They may dispute that, but for purposes here, it has nothing to do with the structure of the implant. This is an implant. This is a claim for an oversized implant, and it's defined by the body of the claim, which just defines dimensions. But are you challenging the construction that says it has to be able to be inserted laterally, has to be capable of lateral insertion? We don't, Your Honor, because 206, what the court said is that's not limiting. Well, you're talking about the preamble, but- No, Your Honor. Actually, if I may read it to you? Yeah. It's right below. So if you see the number one, if you're on page 206, the court construes and gives the construction to which you're referring. And this is key, because this is language they actually leave out of their brief. As stated above, the court- This is the second sentence under the paragraph break. As stated above, the court found that the preambles of independent claims 1, 35, and 61 are not limiting. And therefore, the court's use of the term capable cannot be read to impose additional limitations into the 973 patent that are not otherwise set forth in the claim language. So the court says- I mean, it's a bit confusing, but the court also instructed the jury that it has to be capable of translateral insertion, right? Yes, Your Honor. Capable of being inserted translaterally. But that just, under this court's case law, that doesn't add anything. There's no there there. This is an apparatus claim, and that's just the label for it. So if it meets the dimensions of the claim, it's capable of being inserted translaterally. I'm not following that, because what they're saying is, and they put on evidence to this effect, that it's not capable of lateral insertion, because if you're going to insert it laterally, it has to have the ridges in the right place, and so on and so forth. It'll pop out if the Brannigan thing were inserted laterally, right? I mean, that's basically their contention. That's what they claim, Your Honor, but there's nothing in the claim. If I may step away from the podium and grab my hat. There's nothing in the patent that- Oh, I actually have it here. There's nothing in the patent claim that says- This is claim one. A translateral spinal implant for insertion from the lateral aspect of the spine in the disk space between two adjacent vertebrae. All non-limiting. Not challenged. All non-limiting. Yes, a translateral spinal implant is capable of being inserted translaterally, but capable of not limiting. It doesn't add anything that's not in the claim. So the only thing in this claim is the body, which is the following. Said implant having a length that is greater than one-half the transverse width of the vertebra, said length being substantially greater than the depth of the vertebra, and a height for contacting each of the two adjacent vertebrae. I mean, this is an apparatus claim. It isn't for- The intended purpose is not relevant. If you meet the dimensions of this oversized implant, you infringe, and if you meet it, you anticipate. In the Brantigan implant, the inventor conceded that the Brantigan implant is essentially the same size as the preferred embodiment. And we have that in our brief, both in our applied brief we have a chart, and our read brief we have a chart, showing that the dimensions of the prior Brantigan implant map precisely onto the preferred embodiment. That's all there is to this patent, and it is anticipated. This never should have gone to a trial. We moved for summary judgment before the trial on this basis, and it should have been granted. Once the claims were construed where the preamble didn't have all these things in it, so Judge Dyke, to your point, did dependent claims have tool holes? They call for engagement means. So, for example, Claim 18, the implant of Claim 1, which said implant includes a driving engaging means, like a tool hole. The things that they're trying to read into Claim 1 are not there. And the inventor testified when he was asked, does it have to fan coast to coast? Does it have to have a tool hole? No, it doesn't need to be in the claim. It's not in the claim. It needs to be in the claim if you want to use those limitations to distinguish prior art. And it isn't there. And they don't challenge, I mean, the language that I read you from the jury instruction, they don't even put in their brief. So they don't challenge it. And capable of, under this court's case law, this is nothing more than a label for what they called this oversized implant, a translateral spinal implant. Let me have the citation in the appendix to the jury instruction you're talking about. It's A-206, Judge Rainier. Okay, I was looking at that. And so the first paragraph, and this was a huge debate at the trial, just so you know. I mean, we made a motion for summary judgment. We made a motion in limine to keep them from trying to turn capable of into a Trojan horse. And then we asked for a limiting instruction, most of which we got, and most of which is in here. And nevertheless, that's how they got this revert that they got. So, Judge Rainier, the point, the sentence, the 9.2, is right below, in Claim Constructions, the 973 patent, it's the second full sentence under the 1. As stated above, the court found that the preambles of independent claims 1, 35, and 61 are not limiting, and therefore the court's use of the term capable cannot be read to impose additional limitations. So the only limitations in this patent are those in the body of the claim. The body of the claim only includes conventions. They could have written it differently. They didn't. And it's anticipated by the Brannigan Prior Art. Can I talk about the 9.33? Unless, I don't know, did Judge Rainier have any other questions? Yes, thank you, Judge Dyke. The 9.33, in the 9.33, what they're trying to do is mix and match the element. And under the way that the claim is written, they can't do that for DOE because it violates the structure, the way that the claim sets forth the structure. So claim 1 requires a retractor with a first and second portion that form a working channel, with said working channel being closed by said first portion and said second portion. This is on page A275. And then the second part, so you've got said working channel being closed by said first portion and said second portion. Now, Nuvasa's retractor has three blades, one of which, and when joined, they close all together to create a working channel. That was what they testified to. But it's three blades, not two. But the claim goes on. And it requires said working channel, said first and portions, said working channel is enlargeable by laterally moving each of said first and second portions away from one another and pivoting each of said distal ends, of said first and second portions away from one another such that only a portion of said working channel is enclosed by said first and second portions. You're saying there can't be a third? I'm saying that for them to have any hope of their theory, our third would have to move. And it does. To come within a doctrine of quibble. Yes, Your Honor, because the structure of this is that the blades close to create the working channel. And then each of the blades laterally moves from one another and the distal ends pivot away from one another. And the third blade in Nuveza's retractor never moves. So they're trying to mix and match their theories. And under Dolly, this court's precedent under Dolly, that's a legal error. You can't have a DOAE theory that violates the way that the elements are structured together in the patent claim. And that's exactly what they're trying to do here. Our third blade does not move. And it's necessary for them to meet the first element. And then the said, it has to be the same elements. And it just doesn't work. So as a matter of law, the infringement of the 933 should be set aside. So in our view, the court should set aside liability on both the 973 and the 933, which would obviate the need to reach any of the damages issues presented by the parties. If I may, I go back to the, unless you want more on the 933, to the damages issues, because it is very important. The convoy sales issue, I don't know if the court would like to direct me as to what you'd like me to spend time on of the remaining, of my remaining time on the damages issues. We're giving your opponent extra time, so we'll give you extra time to deal with these several issues. Thank you very much, Your Honor. So on the lost profits issue, I think I hit my main point, which is Warsaw, which is the patent-owning entity here, it sells nothing in direct competition with Nuvasis. I understand, Judge Ike, your point that they make these inter-company transfers of sales. No, my point is, that I was asking about earlier, for a relatively small part of the profits claim, which relates to the convoy sales of the screws, rods, and biologics. And the question is to the screws and rods, and you're going to give me a cite about this, is whether these screws and rods are specially designed for this implant, or whether they work with others as well, which seems to bear on the functionality issue. And I'm almost certain it's the latter, Your Honor. And that, because of that, let me see if I can find it to stand right here. A surgeon can use one company's retractor in implants, but another's fixation, which is the rods and screws, that's at A11119-22. In fact, surgeons frequently did use Nuvasiv's XLF with Medtronic biologics and fixation. That's at A11186-87, and A11991-92, A12020-21, A12058-59. Ms. Maddie, would you deal with the stopping step issue? Yes, Your Honor. And I just did want to reiterate, may I finish, my fixation is often not, sometimes not used at all, and then it often isn't done in a completely different surgery, or they'll turn you over and do it in from the back, so it's not even done from the side. On the 236, Your Honor, the evidence at trial, Raymond, our expert, testified that the stimulus signal in the accused product, upon triggering a reaction, stops, notifies the operator of the response, drops down a level and starts a new stimulus signal. When you say stops, does it stop, does the entire emission of the signal stop, or is it that the pulse changes the frequency? So the, it's important that the stimulus signal is a train of pulses. So in the patent, the figures show a train of pulses. Up, up, up, up, hit, and then this is the way their product works. Hit, down, that's a new stimulus signal. Up, up, up. So a stimulus signal is a train of pulses. So in their product, to answer your question, the pulses continue. Looking for another nerve, is that the idea? Looking for, if you move, it might just make sure you're not, are you still far away from that one, are you looking for another one? The prior art to which they refer, which is the Raymond patent, Raymond was the expert who testified for us, the prior art to which they're referring is his patent. He said this was a difference than what his patent did. His patent was looking for a nerve like to administer anesthesia. And in the prosecution history, what we say about that is, we would, in the Raymond patent, you would continue to stimulate the nerve, maybe at a lesser amount, but nevertheless continue to stimulate the nerve because you're trying to find it. Here, we're trying to avoid it. But it stops too, doesn't it? I mean, under Raymond, the signal will change frequencies. It'll alter. Otherwise, don't you damage a nerve if you continue at that same frequency at which it was detected? My understanding is in the Raymond patent, it may drop down, but it doesn't stop that signal. In our patent, the stimulus signal is a train of pulses that stop, and it restarts a new stimulus signal. When it drops down, that's a new stimulus signal within the meaning of the patent. So yes, in their product, the pulses continue. They even continue at the same rate as he was saying. But the jury was entitled to conclude under the evidence here, and they put on no expert evidence to the contrary. They just crossed our expert, who under cross-examination, continued to maintain, yes, the pulses continue, but that's a new stimulus signal. Once you've gotten the response, and it has sent the indication to the monitor, the fact that it continues, it's repeating claim one, which is also the two repeating claims. It's simply repeating claim one. And there would be no basis to reverse the jury verdict, given the record here on that issue. All right. Thank you, Ms. Maynard. We'll give you five minutes for rebuttal on your cross-field issues. Thank you very much, Judge Lord. Your Honor, let me pick up with just the 236 patent briefly. I think that the entire issue revolves around the fact that the admissions at trial that Mimiclips performs no differently than Raymond. And I'll cite the court to appendix 11362, and then 11365, 11376, all the way up to 11376, the other two important parts of the appendix. Counsel said that the difference between Raymond and the invention is that Raymond may continue to send a signal, a pulse, if you will, that will continue to stimulate the nerve, whereas the 236 says, this is their latest argument, that you stop emitting pulses that will trigger a response, meaning you could still send pulses low enough that won't stimulate the nerve. That's a new signal, right? Well, no, all you're doing is you're decreasing the signal. You're decreasing the intensity. But if I have a signal that's at X frequency and all of a sudden I detect a nerve and it drops down to a lesser frequency, is that not a new signal? Important point, Your Honor. Number one, the frequency does not change. That's undisputed in the record. The signal frequency does not change. The strength changes. Correct, Your Honor. The intensity will change. And while the pulse intensity can change, the same signal, all you're doing, though, is decreasing the intensity of the pulses. Importantly, in the record, there's an admission by Dr. Raymond, and I think it was Dr. Raymond, that the MimicLip system, upon detecting that neuromuscular response, does not stop stimulating the nerve as the pulse is decreasing. And so counsel said, well, the difference between us and Raymond is that Raymond will continue stimulating the nerve as the pulse decreases following the neuromuscular response. But does the amount of the stimulation change? Well, yes, which is why you have the decrease in the pulse. But what their patent teaches is in order to completely protect the nerve from overstimulation, you stop the emission of the signal, period. Where does Raymond say in the transcript that they're the same? His invention and this one are the same. I thought they said he said something quite different. 11.362, Your Honor. Which volume? Boy, that I can't help, Your Honor, with. But I can quote. Now, wait. I want to see it. And so what they're describing here is the phenomenon where you have a series of pulses. Wait, wait, wait. 11.362? Yes, sir. Okay, I have it. It's in volume two. And there's a question, and I don't have the lines, Your Honor, but the question begins with okay. Question, okay? Yeah. All right. And so what they're describing here is the phenomenon where you have a series of pulses. You get a response, a neuromuscular response, and the next thing is the next pulse is lowered in intensity, right? That's what's being described in the quote that I just highlighted. And the quote is from Raymond. The answer is yes. Question, that's the same behavior that happens in the nemeclips. That's the accused product. In the nerve proximity mode, that was the accused mode. The answer, that's true. And this isn't the only site, Your Honor. There are additional admissions, and they are cited in our blue brief. Well, if you read on... Okay. If, Your Honors, if I could switch to the capable issue. Importantly, importantly, when we get to the 973, there is no appeal from the court's claims instruction. There is no appeal from the jury instruction. What the court instructed the jury, and it's in the same instruction that counsel quoted, the court instructed the jury that they are not to ignore the language, quote, unquote, said implant, which you do find in the body of the claim language. And if Your Honors look at the instruction that Nuvasiv, the part of the instruction that Nuvasiv seizes on to make the point that the court, that the district court said capable carries absolutely no limitation and is meaningless, okay, what the court said is the preamble does not impose anything beyond what is in the claim. And the district court appreciated that said implant is in the claim. And if we go back to the genesis of all of this, Your Honors, where does the capable of limitation come? It comes from Nuvasiv. Importantly, in Markman, what Nuvasiv argued to the district court is that translateral implant had to be ascribed the meaning capable of translateral implantation. In urging that position, Your Honors, what Nuvasiv cited was the court's opinion in DePuy, and it was the DePuy 469 F3-1021 case. In that case, DePuy, the court stood for the proposition held that an apparatus claim can have functional limitations. And the functional limitation at issue in the DePuy case was a hole for inserting a screw through a, for inserting a screw through it. And in DePuy, the court held that the accused product was not infringing because it did not meet that functional limitation. So for Nuvasiv to argue here on appeal that capable means nothing, is flat out contradictory with the position that Nuvasiv took at claim construction. Importantly, Nuvasiv never, ever asked the court to revisit its claim construction. It never did. What it did do was argue to the district court that it had misinterpreted its own claim construction. And what it does on appeal is raise all sorts of arguments about, you know, the district court shouldn't have let this in, shouldn't have let this in, shouldn't have let this in. Well, these are all abuse of discretion issues, and the case, really, from that perspective, is postured no differently than what we have in the Function Media v. Google decision of this court, 2013, 708 F.3.13.10. If we put, and by the way, if we accept the court's instruction to the jury about capable, that they cannot ignore said implant, that said implant means capable of translateral implantation, meaning of one of ordinary skill in the art, plain meaning to one of ordinary skill in the art, no one disputes, Nuvasiv does not dispute that if you accept that instruction, there was substantial evidence supporting the jury verdict. Importantly, there was another instruction on length. The court, at Nuvasiv's request, at Markman, construed length to mean plain and ordinary meaning to one of skill in the art. Nuvasiv knew full well that when the court adopted that construction, it was not choosing between Nuvasiv's choice, which was longest length, the longest dimension, and Warsaw's. But, Dave, these two implants have the same dimensions, right, in Flanagan and here? Well, that's the difference. When we discuss the length... Is that true? Well, they have the same dimensions, two points, and that's what is actually interesting about the brief. If you look at the brief that Nuvasiv submits on reply, they will have you look at the implants this way. This is the perspective you see in the brief. And they have the same dimensions? Well, they don't. They don't. Because implants are not two-dimensional. If you actually flip the implants over, which they don't show, you'd see a third dimension, a height. What you'd also see is where the insertion end is. I didn't see that there was any briefing about the height being different. Oh, there is in our yellow brief, Your Honor, where we discuss, where we indicate that the 41... Where are you talking about the height? Sure, the 41 millimeter implant. Where? What page? I will get you that. I don't have it at my fingertips. But the height component plays into whether or not it's capable of being implanted laterally. So, here's the point. You take the 41 millimeter implant, and if you look at it two-dimensionally, you say, well, it's got a length that meets the limitation. And they say, well, if you take the one that was meant for the lower lumbar region and shove it up a couple of levels, there you go. Now, if you look at that length, it's going to have a length that is substantially deeper than the depth of the vertebral body as you walk up the column. The problem is at that level... Mr. Duchot, I think the extra time we've given you has expired. We'll hear from Ms. Maynard on the cross-field issues, and if you, at the conclusion of that, can give us the page number, we will accept that. All right. Thank you, Your Honor. You need a caddy. Yes, Your Honor. There's a lot of paper in this case. I don't mean to take up all your time on this, but do you have a thought about the Raymond testimony that they discussed at 11-362, which I'm trying to read just sitting here. It's sort of confusing. What do you understand it to be saying? I think that if one reads 11-362, 11-315 to 11-316, Raymond says it's different. What he's saying, and I think if you read his testimony completely through, it's consistent with what I was saying to Judge Rainey. The pulses continue, but the stimulus signal within the meaning of our patent stops, and a new stimulus signal starts. And he... So at 11... Okay, well, I'll have to read it. I don't mean to take up... Okay, I'm sorry, Your Honor. I direct you. I think he says that his conviction's different at 11-315-362. Thank you. If I can, on the 973, if this isn't preservation of the claim construction arguments, then I don't know how one would preserve it. We made the arguments at Markman. We, as I said, we moved for summary judgment. Made what argument? At Markman, we argued that the preamble was not limiting and that we... But are you challenging the jury instructions on appeal now, right? The jury instruction is consistent with what we were saying. Okay, so the answer is you're not challenging the jury instruction. We have not challenged the jury instruction, although if the court thinks that, and we have made this argument, Judge Dyke, if the court thinks that the district court left these questions to the jury, then we are challenging that. That would be legal error. That's not an abuse of discretion. That's under this court's cases like Exergen. It's legal error to let, to leave, and O2, my growth, legal error to leave claim construction questions to the jury. We think that the court said the preamble is not limiting. Translateral spinal instant means capable of being inserted translaterally, but that's not limiting. And so it's just an apparatus claim with dimensions that are, and to his point about the Brannigan prior art, Judge Dyke, to follow up on your questioning with my colleague, Mr. Michelson, who's the inventor here, he admitted that the prior art Brannigan implant is pretty much the same size as the one that we show in our brief. And the dimensions are, so the 973 preferred embodiment is at A256 column 10, lines 42 to 47, and it gives lengths of 32 to 50, with 42 being preferred, width of 24 to 32, with 26 being preferred, and height of 8 to 16, with 10 to 12 being preferred. And the Brannigan implant falls squarely within that. It's 42 by 28 by 14. And I don't remember any briefing about the height, Judge Dyke. The width, the way they get out of the length is that they shift it. But the ordinary meaning of length is the greatest dimension. This was teed up at claim construction. We asked for plain and ordinary meaning. They asked, or if you need to construe it, the greatest dimension. They didn't ask for plain and ordinary meaning. They asked for leading edge to trailing edge. The court went with ours, plain and ordinary meaning, which is rejecting theirs, yet that's the testimony they went to. We asked the court at summary judgment to keep that out. It ruled for us on summary judgment, but at the very least, don't let them argue that to the jury. So if you think that he didn't decide that, then we definitely preserved our rights to that question. And we would say, you should decide. Length is the greatest dimension. That's the ordinary meaning of length. There's certainly no express disclaimer here or lexicography in the specification. All of the places to which they point in the specification with respect to length completely consistent with length being the greatest dimension. That was the greatest dimension of all the prior art patents as well. To the extent his arguments go to, it matters which particular vertebra you're sticking it in, well, then these patents are indefinite or they're mixed method apparatus patents. If you have to know, which is what they told the patent office to get overcome, they're indefinite rejection. If you have to know the occasion of its use, it's indefinite. So they can't have it both ways. Indefinite is a legal question. This court could decide on that basis just as readily. They've always argued that you have to know its use in order to know whether or not it's infringing. Thank you, Ms. Maynard. Thank you, Judge. Mr. Duchot has a page number. We'll take the case under revision. Thank you very much.